RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ALAN HOOVER,

                *Plaintiff-Appellant*,

          *v.*

TIMOTHY WALSH; MICHAEL GONDEK;
Dearborn Heights Police Lieutenant
CUMMINS,

                *Defendants-Appellees*.

No. 11-1333

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-14068—David M. Lawson, District Judge.

Decided and Filed: June 13, 2012

Before: SUTTON, McKEAGUE, and RIPPLE,[*] Circuit Judges

_____

**COUNSEL**

**ON BRIEF:** Christina D. Davis, ROMANO LAW, P.L.L.C., Southfield, Michigan, for
Appellant.  Karen M. Daley, CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C.,
Livonia, Michigan, for Appellees.

_____

**OPINION**

_____

RIPPLE, Circuit Judge.  Alan Hoover, a combat veteran who served with the
United States Marine Corps in Iraq, alleged that police officers violated his Fourth and
Fourteenth Amendment rights by stopping his vehicle, prolonging the traffic stop into
an investigatory detention, transporting him to a police station and having him
committed for psychiatric evaluation, all without justification.  He initiated this action

---

[*]The Honorable Kenneth F. Ripple, Circuit Judge of the United States Court of Appeals for the
Seventh Circuit, sitting by designation.

1

in a Michigan state court, asserting a claim under 42 U.S.C. § 1983 along with state law claims for false arrest, false imprisonment, and assault and battery. The defendants removed the case to the United States District Court for the Eastern District of Michigan and moved for summary judgment on the basis of qualified immunity. The district court granted summary judgment for the defendants; it held that their actions did not violate constitutional norms.[1]

The district court was correct; accordingly, its judgment is affirmed.[2]

# I

## BACKGROUND

### A. The Traffic Stop & Investigatory Detention

At approximately 1:20 a.m. on October 19, 2007, Corporal Timothy Walsh and Officer Michael Gondek of the Dearborn Heights, Michigan, Police Department responded[3] to a report of a suspicious vehicle near the intersection of Beech Daly Road and Eton Street, a "regularly patrolled" area with a "high incidence of vehicle break[-]ins and home invasions."[4] When they arrived at the intersection of Currier Street and Fellrath Avenue, the officers observed a white Dodge Neon, which they later learned was being driven by Mr. Hoover.[5] The officers were stopped at the intersection when the Dodge Neon approached, but they flashed their lights to indicate that it should enter the intersection before them.[6] Mr. Hoover then turned east on Currier Street, and the

---

[1] The district court's jurisdiction is predicated on 28 U.S.C. §§ 1331, 1343 and 1367.

[2] This court's jurisdiction is predicated on 28 U.S.C. § 1291.

[3] Corporal Walsh and Officer Gondek were riding together in a single police vehicle that shift. R.15-6 at 5 (Walsh Dep. 10).

[4] R.12-6 at 3 (Walsh Aff. 2); *see also* R.15-9 at 4 (Cummins Dep. 9).

[5] The record is devoid of any description of the suspicious vehicle that they were dispatched to find, but it does not appear to have been the white Dodge Neon. *See* R.12-6 at 3 (Walsh Aff. 2).

[6] The parties disagree about who first stopped at the intersection. Mr. Hoover asserts that the officers were stopped when he approached the intersection. R.15-2 at 51 (Hoover Dep. 192). The officers contend that Mr. Hoover was "sitting at the stop sign, just sitting there," when they approached the

officers turned to follow. From behind the Dodge Neon, they could see that the car was "full of" clothing and household items that blocked the driver's view out of the rear windshield and side windows.[7] As the officers followed the Dodge Neon, it drove east on Currier Street, took the first right to head south on South Beech Daly Road, took the third left to head east on Van Born Road and then made a left onto the first through-street to head north on South Gulley Road. The car then went several blocks north, crossing the intersection with Currier Street.[8] This route aroused the officers' suspicions because it was not the most direct path the Dodge Neon could have taken to get from Beech Daly Road to that section of Gulley Road. The officers initiated a traffic stop on Gulley Road near Eton Street, approximately three blocks east and three blocks north of where they first began following Mr. Hoover. The traffic stop was recorded by a camera in the officers' vehicle, and that video is in the summary judgment record.

After stopping the Dodge Neon, Corporal Walsh approached the vehicle and requested that the driver—Mr. Hoover—produce his license and the car's registration. Mr. Hoover did not have his license with him and instead gave Corporal Walsh his military identification card. He did not provide his registration or any other documents. At the time, Mr. Hoover appeared "very nervous"; he was chain-smoking and refused to make eye contact with officers.[9] During the stop, the officers observed that clothes and other personal items were "piled"[10] or "thrown"[11] into the car; there was no indication that they had been packed. They also observed Mr. Hoover's son, then about one-and-a-half years old, sitting in a child seat in the rear of the vehicle with a bag of

---

intersection. R.15-6 at 4 (Walsh Dep. 8). At this point in the proceedings, we accept, as we must, Mr. Hoover's recitation of the disputed fact.

[7] R.15-6 at 4 (Walsh Dep. 9); *see also* R.15-8 at 4 (Gondek Dep. 6). Mr. Hoover admitted in his deposition that the objects in his car "may have" blocked portions of his rear and side windows, although he asserted that he had "full visibility." R.15-2 at 63-64 (Hoover Dep. 241-42).

[8] *See* R.12-6 at 3 (Walsh Aff. 2); R.15-2 at 51-52 (Hoover Dep. 193-96).

[9] R.15-8 at 4 (Gondek Dep. 9); *see also* R.15-9 at 4, 9 (Cummins Dep. 8, 27).

[10] R.15-9 at 4 (Cummins Dep. 9).

[11] R.15-6 at 11 (Walsh Dep. 37).

diapers on his lap.[12]  One officer described the child as "virtually underneath a pile of[] . . . a diaper bag and under some clothes.  I could only see his face."[13]

The officers asked Mr. Hoover where he was going.  According to Mr. Hoover, he told them that he was driving from one friend's house to another's, and he provided the names of both friends and described where they lived, but apparently without providing exact addresses.[14]  The officers also asked about the personal property in the car and about the child.  Mr. Hoover said that the personal property belonged to him and that the child was his son.  At some point during the conversation, Mr. Hoover also told the officers that he was driving to his mother's house in Ohio and indicated that he was visiting friends to say goodbye.[15]  When the officers inquired as to the whereabouts of the child's mother, Mr. Hoover told them that his wife would be joining him in Ohio and that she was aware that he was leaving the state with the child.[16]  He initially told the officers that he did not know where his wife was at the time, but he later suggested that she might be at her parents' house and gave the officers their phone number and address.[17]  When asked whether he and his wife had been involved in a domestic dispute, he denied that such was the case.  During the traffic stop, Lieutenant Keith Cummins responded to the officers' request for a supervisor.

Through their dispatcher, the officers requested that an officer with the Allan Park Police Department go to Mr. Hoover's in-laws' house to confirm his story.

---

[12]R.12-6 at 4 (Walsh Aff. 3); *see also* R.15-2 at 52 (Hoover Dep. 197).

[13]R.15-6 at 5 (Walsh Dep. 11).

[14]R.15-2 at 53 (Hoover Dep. 199-200).  This account conflicts with information provided by the officers, who contend that Mr. Hoover did not identify either friend and that he could not provide either friend's address.  R.15-6 at 5 (Walsh Dep. 11); R.15-8 at 5 (Gondek Dep. 11-12); R.12-6 at 4 (Walsh Aff. 3).

[15]R.15-2 at 53-54 (Hoover Dep. 201-02).

[16]*Id.* at 55 (Hoover Dep. 206-07).

[17]*Id.* at 54 (Hoover Dep. 204-05).  The officers tell a different story.  In his deposition, Corporal Walsh testified that Mr. Hoover provided only his own home phone number and that the officers obtained his in-laws' address through a check of the license plate number of the Dodge Neon, which was registered to Mr. Hoover's father-in-law.  R.15-6 at 6 (Walsh Dep. 15); *see also* R.12-6 at 6 (Walsh Aff. 5).

Thereafter, the dispatcher informed the officers that Mr. Hoover's wife was reporting that "there was a domestic incident and[ that] she does believe the father is trying to escape town with the child."[18] When confronted with his wife's statements, Mr. Hoover admitted that he and his wife had been involved in a domestic dispute. He told the officers that his wife had assaulted him and that she also had done so on previous occasions.[19]

The officers then decided to transport Mr. Hoover to the police station for further investigation. Approximately thirty-seven minutes after they initiated the traffic stop,[20] the officers ordered Mr. Hoover out of his vehicle and handcuffed him, which is "[s]tandard procedure" before Dearborn Heights police officers transport someone.[21] After Mr. Hoover was handcuffed and secured in a police vehicle, the officers learned that his father-in-law, the registered owner of the vehicle that Mr. Hoover had been driving, did not want the Dodge Neon taken out of the state.[22] The officers later stated that they believed that further investigation was needed into possible domestic violence, parental kidnapping and the taking without permission of a vehicle. As far as officers knew at the time, there were no outstanding warrants for Mr. Hoover's arrest or police reports regarding the child. When the officers began driving Mr. Hoover to the police station, a total of about fifty minutes had elapsed from the time of the stop.

---

[18] R.12-7 at 36:06-36:14. The record is unclear regarding whether the Allan Park officer relayed the wife's information to his dispatcher, who then relayed it to the Dearborn Heights dispatcher, who provided it to the officers at the traffic stop or whether Mr. Hoover's wife called the Dearborn Heights Police Department dispatcher directly. This does not appear to be an important facet of the case, as it is undisputed that Corporal Walsh and Officer Gondek received information that originated from Mr. Hoover's wife while at the scene of the traffic stop. R.15-2 at 56 (Hoover Dep. 210).

[19] The officers assert that Mr. Hoover lifted his shirt to show them scratches on his back as evidence of his claim that his wife assaulted him. R.15-6 at 6 (Walsh Dep. 16-17); R.15-8 at 7 (Gondek Dep. 20-21); R.15-9 at 7 (Cummins Dep. 19). Mr. Hoover denies doing this. R.15-2 at 56 (Hoover Dep. 213). The video recording of the stop reflects that Mr. Hoover did raise his shirt and display his back to the officers, but there is no discernible audio and the video does not capture whether his back was scratched. R.12-7 at 37:27-37:37.

[20] We rely on the video recording of the stop to determine the length of the encounter.

[21] R.15-8 at 6 (Gondek Dep. 17).

[22] R.15-6 at 6 (Walsh Dep. 17); *see also* R.12-6 at 6 (Walsh Aff. 5).

## B. The Station Interview

At the police station, Mr. Hoover spoke with Corporal Walsh.[23] He told Corporal Walsh that he had experienced "flashbacks," presumably relating to his military experiences in Iraq, and that he had been using "distraction techniques" while talking to the officers at the scene of the traffic stop.[24] Corporal Walsh later testified that Mr. Hoover told him that he had been having "problems" since returning from Iraq.[25] Mr. Hoover also told Corporal Walsh that the police station was "full of improvised weapons" and that he could unlock his handcuffs with a pen.[26]

Mr. Hoover's wife came to the police station and spoke with Officer Gondek and Lieutenant Cummins. According to Officer Gondek's later testimony, she told the officers "[t]hat there had been a domestic violence [incident] at the residence and Mr. Hoover fled with the child."[27] Additionally,

> [s]he stated that, the specifics of the domestic violence, items being thrown around, Mr. Hoover having problems adjusting from his service in Iraq, stating he was becoming increasingly violent. She stated that he was, made suicidal comments to her, attempted to, suicide by ramming his head through the drywall numerous times. She stated that he threw the TV at her almost hitting the crib[] . . . .

---

[23] Mr. Hoover asserts that, while at the police department, he was mocked by a female sergeant who called him an abusive husband and who was "talking smack about [a friend of Mr. Hoover] dying and . . . talking smack about the Marine Corps as a whole." R.15-2 at 72 (Hoover Dep. 274). The sergeant is not a party to this litigation, as Mr. Hoover could not identify her or provide more than a rudimentary description. *Id*. at 76-77 (Hoover Dep. 293-95).

[24] *Id.* at 58 (Hoover Dep. 218-20).

[25] R.15-6 at 9 (Walsh Dep. 28-29). Mr. Hoover stated that he did not recall making this statement, but he did not deny it. R.15-2 at 57 (Hoover Dep. 217).

[26] R.15-2 at 58 (Hoover Dep. 220-21). Corporal Walsh testified that, during the course of his interaction with Mr. Hoover on the way to and then at the police station, Mr. Hoover also said that he thought the potholes in the street were improvised explosive devices (IEDs), that he viewed police as the enemy and that he thought about ways to kill police officers with a pen. R.15-6 at 9 (Walsh Dep. 28-29). Mr. Hoover denies making these statements. R.15-2 at 58 (Hoover Dep. 218-21).

[27] R.15-8 at 7 (Gondek Dep. 18).

She was concerned for her safety, the safety of her child and safety of her husband.[**28**]

An affidavit later supplied by Mr. Hoover's wife supports Officer Gondek's account, stating that, while she was at the police department, she "advised the Dearborn Heights police officers of the events of October 18, 2007."[**29**] According to that affidavit:

On October 18, 2007, Alan [Hoover] accused me of having an affair. He disrobed and attempted to force me to have sex with him. I refused and he began destroying things in the house. Alan picked up our son's TV and threw it into our son's crib, destroying the crib. Alan threw his shoulder into the bedroom wall, putting a hole through the drywall. Alan then walked through the house tipping over and destroying furniture. He was yelling, screaming and bashing his body into walls. He went into the bedroom and turned over the bed and mattresses.

In response to Alan's tirade, I attempted to leave the residence. I started filling a bag with children's clothing. Alan tore the bag open. I attempted to fill a pillow case which Alan dumped out. Alan then ripped my son from my hands, took the car keys and walked toward the door. I attempted to stop Alan. He ran into me, shoved me to the side and left the residence in our car with our son on his lap.

During the incident of October 18, 2007, Alan Hoover was ranting and making suicidal threats. He ran headlong into walls. He bashed his head into walls. He was throwing furniture. He picked up a kitchen knife, held the point at the side of his neck and threatened to kill himself. He asked me if that was what "I wanted[."] He stated[,] "I wish I had never come home from Iraq[,]" and[,] "I want to die[."] He also told me that he wanted to buy a gun and "take out my whole family[."] He told me that he wants my family "to die" and "to suffer[."] He indicated that it would likely be better if he "killed himself" because that way he could not "take out" my family.[**30**]

---

[**28**] *Id.* (Gondek Dep. 19); *see also* R.15-9 at 9-10 (Cummins Dep. 29-30). Mr. Hoover concedes that he did not see his wife or her father at the police station and therefore has no firsthand knowledge of what information, if any, they provided to police officers. R.15-2 at 58-59 (Hoover Dep. 221-23).

[**29**] R.12-3 at 5 (Spouse Aff.); *see also* R.15-8 at 7 (Gondek Dep. 18); R.15-9 at 9-10 (Cummins Dep. 29-30).

[**30**] R.12-3 at 4 (Spouse Aff.) (paragraph numbers omitted). In his deposition, Mr. Hoover disputed whether he had engaged in some of the actions that his wife described in her affidavit, as well as disputing the way certain acts were characterized. *See* R.15-2 at 38-39 (Hoover Dep. 141-42) (testifying that he was conducting "a test" when he held up a knife and threatened to commit suicide and that he had no intent to kill himself). However, what matters is what the police knew at the time, and Mr. Hoover acknowledges that he is unaware of what his wife told the officers.

Officer Gondek and Lieutenant Cummins spoke to Mr. Hoover's wife about her options regarding the attempted suicide and threats; at her request, they explained the process for having Mr. Hoover committed for psychiatric evaluation. Mr. Hoover's wife "stated that she wanted to sign Mr. Hoover in for evaluation" and asked the police officers to drive him to the hospital.[31]

## C. The Involuntary Commitment

Corporal Walsh and Officer Gondek drove Mr. Hoover to the hospital. According to Mr. Hoover, a physician spoke to him for about an hour in the presence of the officers.[32] At the end of that conversation, again according to Mr. Hoover, he overheard the physician tell the officers that he did not have enough information to commit Mr. Hoover for involuntary psychiatric evaluation and that he would have "to be committed by somebody."[33] Mr. Hoover asserts that the officers then stepped out of the room, but that he could see, through a small window, Corporal Walsh speaking to his wife. His wife filled out a petition for Mr. Hoover to be committed for evaluation, writing that he had been "[t]hreatening to commit suicide with kitchen knives, damaging the home with his body by running into walls, bashing his head against walls, throwing furniture, saying threatening words against me and our son, and saying things such as 'I wish I never came home from Iraq' and 'I want to die.'"[34]  Based on his wife's

---

[31]R.15-8 at 7 (Gondek Dep. 19).

[32]Lieutenant Cummins was not at the hospital. R.15-2 at 30 (Hoover Dep. 106).

[33]*Id.* at 29 (Hoover Dep. 105).

[34]R.12-8 at 2. Mr. Hoover contends that the officers coerced or persuaded his wife to fill out the petition, but he provides only two pieces of evidence to support this assertion and neither can support the weight he puts on it. Mr. Hoover first asserts that, although he could not hear the conversation between Corporal Walsh and his wife, he was able to interpret the officer's body language by virtue of counterinsurgency training he received in the Marine Corps. We do not believe that Mr. Hoover's impression of the officer's body language as he has described it is a sufficient basis upon which this court can draw a reasonable inference that his wife was persuaded or coerced to fill out the petition for commitment.

Mr. Hoover further asserts that he later spoke to his wife and asked her why she had put that information on the petition and that she told him, "because the cops told me to." R.15-2 at 42 (Hoover Dep. 156-57). This statement, however, is being submitted for the truth of the matter asserted and thus is hearsay. "A court cannot rely on unsworn inadmissible hearsay when ruling on a summary judgment motion." *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004) (stating the holding of *More v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993)). Because his wife has indicated in an affidavit that the officers did *not* coerce her—or even converse with her at the hospital—Mr. Hoover appears unable to

petition, Mr. Hoover was admitted for psychiatric evaluation.  He was later transferred to a VA hospital, kept over the weekend and released on the following Monday.

Mr. Hoover filed suit in a Michigan state court, asserting a claim under 42 U.S.C. § 1983 along with state law claims for false arrest, false imprisonment, and assault and battery.  The defendants removed the case to the United States District Court for the Eastern District of Michigan and moved for summary judgment on the basis of qualified immunity.  The district court concluded that the officers had not violated Mr. Hoover's constitutional rights and so were entitled to qualified immunity.  Similarly, the district court determined that the officers had probable cause to arrest Mr. Hoover, precluding liability for false arrest and false imprisonment, and that they had used a reasonable amount of force in effecting the arrest, precluding liability for assault and battery.  Accordingly, the district court granted summary judgment for the defendants, and Mr. Hoover timely appealed.

## II

## DISCUSSION

We review de novo a district court's decision to grant summary judgment, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party.  *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (internal quotation marks omitted).  Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When "the evidence is such that a reasonable jury could return a verdict for the [nonmovant]," summary judgment is inappropriate.  *Bazzi*, 658 F.3d at 602.

---

reduce this hearsay to admissible form.  Thus, taking the facts as Mr. Hoover recites them and drawing *reasonable* inferences therefrom, it is fair to state that the officers were at the hospital with him for about an hour and that they had some conversation with his wife, but that Mr. Hoover has no admissible evidence of the content of that discussion.

Additionally, it is worth noting that Mr. Hoover's account of the events at the hospital differs greatly from the testimony of Corporal Walsh and Officer Gondek, as well as an affidavit provided by Mr. Hoover's wife, all of which indicate that, after arriving at the hospital, the officers promptly turned Mr. Hoover over to medical personnel and left without any significant interaction with Mr. Hoover's wife. R.15-6 at 10 (Walsh Dep. 31-33); R.15-8 at 8 (Gondek Dep. 23); R.12-3 at 5 (Spouse Aff.).

## A.  The § 1983 Claim

A plaintiff proceeding under § 1983 must establish that a person acting under color of state law deprived him of a right secured by the Constitution or by federal law. *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011).  However, the doctrine of qualified immunity shields certain government officials, including police officers, from civil liability in certain circumstances.  To determine whether qualified immunity applies, we engage in a two-step inquiry, determining "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (internal quotation marks omitted).[35]  We may address these prongs in either order; indeed, either one may be dispositive.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).[36]  Once the defense of qualified immunity has been raised, it is the plaintiff's burden to demonstrate that the defendants cannot avail themselves of it.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

Mr. Hoover contends that the Dearborn Heights police officers lacked any justification for stopping his vehicle, detaining him, transporting him to the police department and taking him to the hospital where he was committed for psychiatric evaluation.  The officers' actions, Mr. Hoover contends, violated his Fourth and Fourteenth Amendment rights.  We shall address each phase of his encounter in turn, keeping in mind that the determination of whether the officers' actions were justified depends on the reasonable inferences that can be drawn from the knowledge they had at the time they acted.  *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003).

---

[35]In certain cases, we employ a third step in the qualified immunity analysis under which we determine whether the plaintiff has introduced sufficient evidence to support the inference that the official's contested action "was objectively unreasonable in light of the clearly established constitutional rights." *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006) (internal quotation marks omitted).  This third step is not necessary when "the case at issue is one of the many cases where, if the right is clearly established, the conduct at issue would also be objectively unreasonable." *Id.* (internal quotation marks omitted).  Instead, we "collapse[] the second and third prongs in an effort to avoid duplicative analysis." *Id.* (internal quotation marks omitted).  That is the course we follow in this case.

[36]The order in which we address the two prongs of the qualified immunity analysis depends on the unique circumstances in each particular case, which requires us to balance the interest in judicial economy and the danger of premature constitutional adjudication against the interest in developing meaningful constitutional precedent.

**1.**

The officers' encounter with Mr. Hoover began when they conducted a traffic stop.[37] "Stopping and detaining a motorist 'constitute[s] a "seizure"' within the meaning of the Fourth Amendment even if 'the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (alteration in original) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). We previously have held that a traffic stop is justified when a police officer has reasonable suspicion of an ongoing crime or a completed felony or when he has probable cause to believe that a civil traffic violation has been committed. *United States v. Sanford*, 476 F.3d 391, 394-95 (6th Cir. 2007).[38]

The district court took the view that the officers had probable cause to stop the vehicle because the officers observed that the driver's view through the rear window of the vehicle was obstructed. Although the parties do not invite our attention to the

---

[37]We note that there is some evidence in the record that Mr. Hoover has waived any challenge to the legitimacy of his stop. "[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted). We have held that waiver occurs when a party expressly abandons a previously raised issue. *United States v. Denkins*, 367 F.3d 537, 543-44 (6th Cir. 2004). We generally decline to review waived arguments on appeal. *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002).

Here, Mr. Hoover challenged the traffic stop in his complaint and again in his response in opposition to the defendants' motion for summary judgment. During the summary judgment hearing, however, counsel for Mr. Hoover explicitly conceded that the stop itself was justified. The transcript of that hearing reads as follows:

| Ms. Davis: | Good afternoon, your Honor. |
| | Basically, even given the fact that the officers were initially justified to stop Mr. Hoover and -- |
| The Court: | Are you conceding that point? |
| Ms. Davis: | Sure. |
| The Court: | Okay. |
| Ms. Davis: | I will. They, you know, stopped him for the obstructed vision. |

R.24 at 20. Thereafter, it would appear that Mr. Hoover limited his challenge to the length and scope of the stop, arguing only that the traffic stop impermissibly was converted into an investigatory detention. Indeed, such a concession is an intentional abandonment of the argument that the traffic stop itself was unjustified, which precludes appellate review. *See Denkins*, 367 F.3d at 543. We note, however, that the district court did not treat this matter as waived. Nor does the Government, in its appellate brief, treat the matter as waived. Under these circumstances, we shall address the merits. *See United States v. Boudreau*, 564 F.3d 431, 435 (6th Cir. 2009).

[38]Whether a traffic stop for a civil violation is justified when the officer has only reasonable suspicion is a point on which our precedent is unclear. *See United States v. Sanford*, 476 F.3d 391, 394-95 (6th Cir. 2007) (describing the conflict). Our resolution of this case does not require that we address this issue today.

problem, it appears that the district court may have relied upon superceded law in making this determination.**39** Rather than construe Michigan's statutory scheme in the absence of a definitive ruling by the state courts, we prefer to rest our decision on the alternate ground that the officers had reasonable suspicion to conduct an investigatory stop in light of the totality of the circumstances.

As the Supreme Court held in *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may seize an individual without offending the Fourth Amendment if the "officer has reasonable suspicion that criminal activity may be afoot." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). We have explained that a *Terry* stop requires "a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts." *Smoak*, 460 F.3d at 778-79 (alteration in original) (internal quotation marks omitted). We determine whether an officer has the requisite quantum of proof by looking at the totality of the circumstances. *United States v. Galaviz*, 645 F.3d 347, 353 (6th Cir. 2011). This analysis requires us to consider "*all* circumstances surrounding the actions of a suspected wrongdoer." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (emphasis in original) (internal quotation marks omitted). "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time

---

**39**The defendants contend that the stop was justified under a Michigan law that prohibits the operation of a motor vehicle when "[a]n object . . . obstructs the vision of the driver of the vehicle, except as authorized by law." *See* Mich. Comp. Laws § 257.709(1)(c). This version of the law was not in effect at the time Mr. Hoover was stopped. Prior to a 2010 amendment, the provision prohibited the operation of a motor vehicle when "[a] dangling ornament or other suspended object . . . obstructs the vision of the driver of the vehicle, except as authorized by law." Mich. Comp. Laws § 257.709(1)(c) (2007). The defendants do not claim, and the record does not suggest, that Mr. Hoover's view was obstructed by a "dangling ornament or other suspended object," nor do they contend that the version of the law in effect at the time of the stop proscribed obstructions *other* than dangling ornaments or suspended objects. Further, this version of the statute has been applied only to obstructions hanging from the rearview mirror that block the driver's vision out of the front windshield, but the defendants do not claim that Mr. Hoover's view out of the front window was obstructed.

This is not to suggest that Mr. Hoover's vision was entirely unobstructed. It was not. The video recording of the traffic stop, taken by a camera mounted in the officers' vehicle, shows clearly that a large portion of his rear window is blocked by items that extend to near the roof of the passenger compartment. R.12-7. A different statutory provision, one that exists in identical form today, states that "[a] person shall not drive a motor vehicle if driver visibility through the rear window is obstructed, unless the vehicle is equipped with 2 rearview mirrors, 1 on each side, adjusted so that the operator has a clear view of the highway behind the vehicle." Mich. Comp. Laws § 257.709(2). As the video shows, Mr. Hoover's vehicle had two external rearview mirrors, one on either side of the car. The defendants have offered no argument or evidence suggesting that they had any reason to believe that those mirrors were improperly positioned or adjusted in such a way that Mr. Hoover lacked "a clear view of the highway behind the vehicle," *id.*, and Mr. Hoover asserted in his deposition that he had "full visibility," R.15-2 at 63 (Hoover Dep. 241-42).

of day during which the suspicious activity occurred." *Campbell*, 549 F.3d at 371. We must consider these circumstances as a unified whole rather than as a series of disconnected facts; "[t]he lawfulness of an investigatory stop is judged by the totality of the circumstances to 'determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *Id.* at 370-71 (quoting *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006)). Reasonable suspicion requires more than a "mere hunch," but "less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (internal quotation marks omitted).

In this case, officers responded to a suspicious vehicle complaint at 1:20 in the morning. When they arrived in the area—a residential neighborhood with a high number of vehicle burglaries and thefts[40]—they encountered a white Dodge Neon that was packed with loose clothing and household items.[41] They followed the car as it traveled east, south, east and then north on main streets and neighborhood side streets, stopping it approximately three blocks east and three blocks north of where they first began following it. These circumstances, they contend, are sufficient to establish reasonable suspicion of criminality.

It is well-settled that, standing alone, mere presence in a high crime area is insufficient "to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). However, "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id*. (quoting *Adams v. Williams*, 407 U.S. 143, 144 (1972)). The same is true with regard to the time of day: It is relevant without being independently dispositive. *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009). Similarly, "nervous, evasive behavior is a pertinent factor in determining reasonable

---

[40]The officers describe the neighborhood as "regularly patrolled . . . [with] a high incidence of vehicle break[-]ins and home invasions," R.12-6 at 3 (Walsh Aff. 2), and, more generically, as a "high crime area," R.15-9 at 4 (Cummins Dep. 9); *see also* Appellee's Br. 14 (referring to "an area known for motor vehicle theft and home invasion").

[41]The officers described the car as "full of debris," R.15-6 at 4 (Walsh Dep. 9), and "numerous items," R.15-8 at 4 (Gondek Dep. 6).

suspicion." *Wardlow*, 538 U.S. at 124. Although headlong flight is "the consummate act of evasion," *id.*, it is clear that frantic flight from officers is not the only evasive act which will arouse an officer's reasonable suspicion. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (holding that a "driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion"); *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (noting that an individual's "[f]urtive movements" and evasive behavior are relevant to determining whether an officer's suspicion was reasonable).

There are a number of ways in which an individual can attempt to evade the police. In *United States v. Horne*, 313 F. App'x 788 (6th Cir. 2008) (per curiam), we held that a late-night seizure of an individual was justified when officers observed the individual in "a hot spot [of] drug and gun activity" acting strangely by "ducking behind" someone else in an apparent attempt to avoid police attention. *Id.* at 791 (internal quotation marks omitted). Similarly, in *United States v. Finley*, 239 F. App'x 248, 252 (6th Cir. 2007), we found that an officer's suspicions reasonably were aroused when two men slouched down in a parked car, again apparently attempting to avoid notice. In the same vein, once an individual is aware that police are behind him, his choice of a circular route or driving with no apparent destination may strike a trained officer as a similar attempt to avoid police attention. "[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419 (1981).[42] Of course, not every act taken to avoid contact with the police will support reasonable suspicion; for example, simply walking away from officers is clearly insufficient to support reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 497-98 (1983); *United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011); *see also Wardlow*, 528 U.S. at 125. As the Second Circuit has noted, "circular driving in the

---

[42]We previously have suggested that an officer may interpret a vehicle driving very cautiously so as not to violate any traffic laws as one of several factors in establishing reasonable suspicion. *United States v. Helm*, 85 F. App'x 475, 477 (6th Cir. 2004).

dead of night in a high-crime area is suggestive" of criminal activity, but it may not be enough, without more, to support reasonable suspicion. *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005).

We do not, and indeed must not, consider these factors in isolation. We do not consider, standing alone, the route that Mr. Hoover traveled—a route that involved main streets and side streets and included driving three blocks south only to drive north for six blocks on a nearby road. Nor may we dwell exclusively on whether a vehicle, loosely packed almost to the ceiling with personal items, was suspicious.[43] Such an occurrence might be entirely unremarkable if it took place at midday in a neighborhood with no particular reputation for burglaries or thefts. Here, however, officers observed a vehicle filled to the brim with piles of clothing and personal items and traveling, at least when police officers were behind it, apparently at random through a neighborhood known for theft and property crimes at 1:20 in the morning. Although there may have been an innocent explanation for all this activity, courts and law enforcement officers must look beyond the possibility of innocent behavior to determine whether the facts support a reasonable suspicion of criminality. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists[] . . . need not rule out the possibility of innocent conduct."). We conclude that, under the facts of this case, the officers' suspicion of criminality was reasonable, justifying an investigative detention.[44]

---

[43] *Cf. United States v. Smith*, 263 F.3d 571, 594 (6th Cir. 2001) (stating that "a slovenly vehicle . . . may indicate perfectly innocent behavior and cannot, standing alone, serve as the grounds for reasonable suspicion," but "[v]iewed in conjunction with other relevant, reasonable factors[] . . . it is possible that [it] may bolster an argument in favor of reasonable suspicion").

[44] We are mindful of Corporal Walsh's deposition testimony that he did not suspect Mr. Hoover of committing any particular crime. R.15-6 at 5 (Walsh Dep. 12). However, both Corporal Walsh and Officer Gondek testified that they found Mr. Hoover's vehicle "suspicious." *Id.* at 4 (Walsh Dep. 9); *see also* R.15-8 at 4 (Gondek Dep. 6). Notably, Corporal Walsh provided more specificity in his affidavit, writing that he "believed that the operator of the Dodge Neon may have been involved in the theft of personal property from a home or vehicle." R.12-6 at 4 (Walsh Aff. 3). In that affidavit, Corporal Walsh justified his suspicion by reciting:

    a.    My partner and I were responding to a suspicious vehicle run.
    b.    The time was 1:20 a.m.
    c.    The area has a high incidence of motor vehicle break[-]ins and home invasions.
    d.    The cabin of the Neon was packed full of personal belongings.
    e.    The Neon traveled in a circular route through a residential neighborhood with no apparent destination.
    f.    It is uncommon for people to move their personal belongings at 1:20

**2.**

Mr. Hoover next challenges the prolonged detention that grew out of the initial stop. Here, we must assess not only what the officers knew at the time of the initial stop but also the information developed during the course of that initial stop. *See United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006).

We have little trouble concluding that, over the course of their initial interaction with Mr. Hoover, the officers developed information that justified a more prolonged investigation. After stopping Mr. Hoover's car because of the suspicious circumstances, the officers observed Mr. Hoover acting "very nervous," chain-smoking and refusing to make eye contact with them.[45] As they stood outside the car, the officers could see that clothing and personal items had been "piled" or "thrown" into the car rather than packed in any organized fashion.[46] Most importantly, they saw a one-and-a-half year-old child in a child seat in the rear of the vehicle, "virtually underneath a pile of[] . . . a diaper bag and . . . some clothes" such that officers could only see his face.[47] The officers acted well within the bounds of their authority by inquiring further about the presence of the child, the circumstances of Mr. Hoover's trip and his destination.

The officers' suspicions were further aroused when Mr. Hoover informed them that he intended to leave the state with his child and that he did not know where his wife was at the time.[48] That Mr. Hoover also told the officers that his wife would be meeting him in Ohio the next day does not render their concern unreasonable. There are, no doubt, lawful reasons for a couple to travel separately to an out-of-state destination in

---

g.     in the morning.
       It is uncommon for people to move their personal belongings in a small vehicle.

*Id.*

[45] R.15-8 at 4 (Gondek Dep. 9).

[46] R.15-6 at 5, 11 (Walsh Dep. 11, 37); *see also* R.15-9 at 4 (Cummins Dep. 9).

[47] R.15-6 at 5 (Walsh Dep. 11); *see also* R.15-2 at 52 (Hoover Dep. 197).

[48] Mr. Hoover later suggested to officers that she might be at her parents' house.

the early morning hours, but law enforcement officers cannot let the theoretical existence of an innocent explanation blind them to the possibility of criminal activity. *See, e.g.*, *Terry*, 392 U.S. at 22 (holding that each of the suspects' actions were "perhaps innocent in itself," but when "taken together[, they] warranted further investigation"). *Cf. Ryburn v. Huff*, 132 S. Ct. 987, 991 (2012) (noting that "there are many circumstances in which lawful conduct may portend imminent violence").

Faced with the circumstances of the stop, the presence of the child, Mr. Hoover's out-of-state destination and his initial professed ignorance of his wife's location, it was reasonable for officers to suspect that Mr. Hoover was attempting to conceal the child from his wife, a possible violation of Michigan's parental kidnapping statute. These concerns fully justified the officers in extending the seizure beyond the limited scope of a brief stop. *See Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999) ("When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate.").

Once justified, an investigatory stop is reasonable if the "degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand." *O'Malley v. City of Flint*, 652 F.3d 662, 670 (6th Cir. 2011) (internal quotation marks omitted). To determine whether a particular detention exceeded the boundaries of a permissible investigative stop, it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). This inquiry turns on the totality of the circumstances. *See United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010).

Applying that test to the case at hand, it is clear that there was no "delay unnecessary to the legitimate investigation of the law enforcement officers." *Sharpe*, 470 U.S. at 687. Mr. Hoover has not alleged that the officers were dilatory in their efforts to verify his story, and the video recording of the stop indicates that they were not. Fearing the possibility of domestic violence or parental kidnapping, the officers spoke to Mr. Hoover, promptly communicated with each other, requested the presence

of a supervisor and detained Mr. Hoover until, through their dispatcher and with the assistance of a neighboring police department, they could make contact with Mr. Hoover's wife. The time from the initiation of the traffic stop until the officers made contact with Mr. Hoover's wife amounted to only thirty-six minutes. Throughout this period, Mr. Hoover sat in his own vehicle. Weighing the duration and relatively non-intrusive nature of the stop against the importance of the interests at stake—including primarily the welfare of the young child in the back of Mr. Hoover's car—we conclude that the officers did not violate the Constitution by prolonging the traffic stop into an investigatory detention.

**3.**

Thirty-six minutes after the officers initiated the traffic stop, they learned from their dispatcher that Mr. Hoover's wife was reporting that there had been "a domestic incident" and that she "believe[d] the father [was] trying to escape town with the child."[49] Within a few minutes, the officers had Mr. Hoover exit his car, put him in handcuffs and had him wait in or near their police car. Shortly thereafter, they transported him to the police station. Mr. Hoover contends that this seizure amounted to an unconstitutional arrest.

An investigative detention that is constitutionally permissible when initiated may "ripen into a . . . seizure that must be based on probable cause." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (internal quotation marks omitted). An "investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003). The determination of reasonableness depends on the totality of the circumstances, and this court previously has looked to "factors such as 'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the

---

[49]R.12-7 at 36:06-36:14.

detainee from leaving police custody, and the use of weapons or bodily force.'" *Id.* (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)).

The dispositive factor in this case is the transportation of Mr. Hoover from the scene of the traffic stop to the police station. The Supreme Court has held:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) (citations omitted). We have recognized this rationale in our own circuit, holding generally that the involuntary transportation of a detained suspect to a police station amounts to an arrest.[50] *See United States v. Smith*, 549 F.3d 355, 360 (6th Cir. 2008). Applying the general rule to this case, the officers' actions transformed their investigatory seizure of Mr. Hoover into an arrest.

An arrest, of course, is constitutionally problematic only in the absence of probable cause. *See Hayes*, 470 U.S. at 815-16. "Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Arnold v. Wilder*, 657 F.3d 353, 363 (6th Cir. 2011) (alteration in original) (internal quotation marks omitted). We have defined probable cause as

---

[50]In rare cases, officers may be justified in relocating a detained suspect even in the absence of probable cause when required for safety or security reasons. *See Florida v. Royer*, 460 U.S. 491, 504 (1983) (noting that "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention"); *United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990) (noting that there was no safety or security concern that would justify the relocation of a detained suspect from the location of the stop to a police vehicle because the suspect "made no attempt to flee," "[t]he officers had no reason to believe [the suspect] was dangerous" and "there were no other people in the area").

"reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) (internal quotation marks omitted).

The officers who stopped Mr. Hoover had probable cause to arrest him for violating the Michigan law that requires a driver to keep his driver's license in his immediate possession at all times while operating a vehicle and to provide it to police officers on request.[51]  *See* Mich. Comp. Laws § 257.311 (2007).  Such a violation constitutes a misdemeanor.  Mich. Comp. Laws § 257.901 (2007); *see also People v. Boykin*, 188 N.W.2d 100, 101 (Mich. Ct. App. 1971).  The parties agree that Corporal Walsh requested Mr. Hoover's driver's license and that Mr. Hoover did not produce one during the length of their interaction.[52]  Consequently, the officers had probable cause to arrest Mr. Hoover before they asked him to exit his vehicle, put him in handcuffs or transported him to the police station.[53]

**4.**

The final phase of Mr. Hoover's interaction with the police officers involves their transporting him to the hospital for psychiatric evaluation.  We have held that "[t]he Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others." *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997); *see also Fisher v. Harden*, 398 F.3d 837, 842-43 (6th Cir. 2005).

---

[51]The defendants suggest several additional statutes that, they assert, a reasonable officer would have had probable cause to believe that Mr. Hoover had violated or was violating.  Having concluded that the officers had probable cause to arrest Mr. Hoover for the failure to produce his driver's license, we need not engage in further inquiry.

[52]Mr. Hoover contends that the officers never intended to arrest him—or even cite him—for the violation.  However, the subjective intent of the arresting officer is not relevant to the probable cause inquiry.  The inquiry is an objective one; "the existence of probable cause 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest'" regardless of the arresting officer's subjective state of mind. *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004)).

[53]It is not necessary to determine with absolute precision the exact moment at which Mr. Hoover's detention ripened into an arrest because the officers developed probable cause before they had Mr. Hoover exit his vehicle, applied handcuffs or drove him to the police station.

Based upon the information that the officers obtained, both from Mr. Hoover himself and from his wife, we have no hesitation in concluding that the officers had probable cause to fear that Mr. Hoover was a danger to himself or to others. While being driven to or interviewed at the police station, Mr. Hoover told Corporal Walsh that he had experienced flashbacks—presumably relating to his traumatic experiences as a combat veteran in Iraq—and that he had been having trouble readjusting to civilian life since returning from his tour of duty. Mr. Hoover also told officers that he was capable of unlocking his handcuffs with a pen and that the police station was "full of improvised weapons," statements that further alerted the officers that caution was warranted.[54]

At the police station, Mr. Hoover's wife confirmed for officers that Mr. Hoover had experienced problems after returning from his service in Iraq, telling them that he had become increasingly violent. She told officers that Mr. Hoover had been violent earlier that evening, that he had destroyed property, that he held a knife to his neck while threatening to take his own life and that he wanted her family "to die" and "to suffer."[55] In the face of this information, there can be little doubt that a reasonable person would have been justified in believing that Mr. Hoover presented a danger to himself or others. Therefore, the officers did not offend the Constitution by detaining Mr. Hoover and transporting him to the hospital for psychiatric evaluation.[56]

We resolve Mr. Hoover's § 1983 claim on the first prong of the qualified immunity analysis, holding that his constitutional rights were not violated because the officers acted with the requisite justification at all stages of their encounter with Mr.

---

[54]R.15-2 at 58 (Hoover Dep. 220-21).

[55]R.12-3 at 5 (Spouse Aff.).

[56]Having explained above that Mr. Hoover has failed to present any admissible evidence that would support his assertion that officers coerced his wife into committing him for psychiatric evaluation, *see supra* p. 9 n.34, we need not address further that claim.

Hoover.**57** Consequently, Mr. Hoover's § 1983 claim cannot survive summary judgment.

## B. State Law Claims

Having disposed of Mr. Hoover's sole federal claim, we now turn to his state law claims for false arrest, false imprisonment, and assault and battery. "[S]upplemental jurisdiction does not disappear when the federal claim that gave rise to original jurisdiction in the first place is dismissed." *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012). "'[I]f there is some basis for original jurisdiction, the default assumption is that the court will exercise supplemental jurisdiction over all related claims.'" *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 716 (6th Cir. 2010) (alteration in original) (quoting *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 892 (6th Cir. 1998)).

Under Michigan law, "[t]o prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause." *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003). "If the arrest was legal, there has not been a false arrest or a false imprisonment," regardless of the possibility of conviction. *Id.* As discussed above, officers had probable cause to arrest Mr. Hoover for failing to produce his driver's license. It follows that summary judgment for the defendants on this ground was appropriate.

"An assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991) (citing *Tinkler v. Richter*, 295 N.W. 201 (Mich. 1940)). Similarly, to establish a viable claim for battery the plaintiff must

---

**57**Because we resolve the issue of qualified immunity by concluding that there was no constitutional violation, we need not address the second prong of the analysis to determine whether Mr. Hoover's rights were clearly established.

demonstrate a "willful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.*

Mr. Hoover's brief on appeal fails to develop meaningfully his assault and battery claim, stating only that the defendants "used threats of force at the scene and at the police station." Appellant's Br. 11, 44. He cites for support only two pages of his deposition transcript, which relate to his testimony that an unknown female police sergeant—who is not a party to this litigation—wanted to fight Mr. Hoover at the police station[58] and that the officers made "some verbal threats but for the most part it was[] . . . just body language."[59] These vague allegations are insufficient to satisfy Mr. Hoover's summary judgment burden. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) (holding that surviving summary judgment requires a plaintiff to provide some concrete evidence on which a reasonable juror could return a verdict in his favor).

## Conclusion

For the foregoing reasons, we hold that neither Mr. Hoover's § 1983 claim nor his supplemental state law claims can survive summary judgment. We therefore AFFIRM the judgment of the district court.

---

[58]R.15-2 at 57 (Hoover Dep. 217).

[59]*Id.* at 65 (Hoover Dep. 247).