NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0429n.06

Case No. 19-1331

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 24, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| PATRICIA SIDERS, | ) | |
| | ) | |
| *Plaintiff-Appellee*, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CITY of EASTPOINTE, *et al.*, | ) | MICHIGAN |
| | ) | |
| *Defendants-Appellants*. | ) | |

BATCHELDER, J., delivered the opinion of the court in which NALBANDIAN, J., joined. STRANCH, J. (pp. 16–25), delivered a separate dissenting opinion.

**Before: BATCHELDER, STRANCH, and NALBANDIAN, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** In this interlocutory appeal, two police officers, in their individual capacities, appeal the denial of qualified immunity from claims of excessive force, failure to intervene, and deliberate indifference to serious medical needs.

The main question in this case is whether a police officer dispatched to the night-time scene of an alleged domestic-violence assault must permit the suspect: (1) to withdraw into a dark minivan and close the door, then (2) to resist physical restraint by kicking the officer and clinging to a seat, and finally (3) to expressly refuse the officer's commands to submit to handcuffing. To be more specific, the plaintiff contends that the officer used excessive force, in violation of her clearly established constitutional rights, by: (1) seizing her bodily and physically removing her from the minivan—rather than allowing her to remain in the minivan and close the door; (2) overwhelming her resistance by brute force—rather than relenting when she kicked him and clung to the seat; and (3) tasing her when she physically and verbally refused to comply after six

orders to place her hands behind her back—rather than permitting her to remain un-handcuffed. The officer claimed qualified immunity, meaning that he is immune from suit if his actions did not violate the suspect's constitutional rights, or if those rights were not clearly established, or if his decisions, even if mistaken, were not wholly unreasonable under the circumstances.

To deny qualified immunity here would be to hold that a suspected domestic-violence perpetrator has a clearly established constitutional right to thwart the responding officer by getting into a car and closing the door, to resist restraint by kicking the officer and clinging to the car's seat, and to refuse the officer's orders for handcuffing. There are no such rights. To be sure, a reasonable person viewing the video of this incident could characterize the officer's actions as impatient, overzealous, and perhaps unnecessary. But whether we personally condone or condemn the officer's conduct is immaterial; the question is whether our constitutional precedent so clearly forbids it that we cannot even construe the officer's actions as a reasonable mistake. Even if we were to agree that the officer was impatient or overzealous, his actions were not wholly unreasonable under the circumstances, and those actions did not violate the suspect's clearly-established constitutional rights. Therefore, he is entitled to qualified immunity.

The plaintiff's other accusations, that the other officer violated her constitutional rights by failing to intervene and deliberately disregarding her serious medical needs, are so clearly refuted by the video evidence as to render them specious. No reasonable juror viewing the videos could conclude otherwise and, therefore, that officer is also entitled to qualified immunity.

We REVERSE and REMAND for issuance of a judgment consistent with this opinion.

## I.

At about 10:45 p.m., on March 18, 2015, Melvin Siders called 911 on his estranged wife, Patricia Siders. The City of Eastpointe police dispatcher broadcasted a call for officers to respond, reporting: 911-caller and wife "are physically fighting" in the driveway, can hear wife "screaming

in the background," caller says wife hit him, weapons unknown. R. 35-3 (police broadcast report). A dashcam video from a responding officer's cruiser recorded the events that follow.

A female officer, Rene Deladurantaye, was the first to respond. The area was dark, lighted only by streetlamps and the lights from the police cruisers. Officer Deladurantaye encountered a minivan, parallel parked at the curb. Melvin, a 30-year-old, 5'5", 190 lb. African-American man in a suit and tie, was standing in front of it. Patricia, a 28-year-old, 5'5", 200 lb. African-American woman in a tank top and jeans, was in the minivan but leaning out of the open driver-side rear door. Three children (ages eight, five, and three) were seated inside the minvan.[1] Melvin was disheveled and holding a "club" by its center, in a non-threatening manner. A "club" is a tradename for a metal bar that locks onto a car's steering wheel to prevent or discourage theft of that car. Officer Deladurantaye told him to put it down and he tossed it aside, claiming that Patricia had attacked him with it. Officer Deladurantaye could see that Melvin had been struck in the face.[2] While Melvin was calm and cooperative, explaining why he called 911 for help, Patricia was yelling and antagonistic.

The second officer on scene was a male officer, Joseph Piro, who arrived almost immediately after Officer Deladurantaye and, because of where he parked his cruiser, it was his dashcam that recorded the on-scene events.[3] Officer Deladurantaye directed Officer Piro to talk with Patricia while she talked with Melvin. As Officer Piro approached Patricia, she withdrew

---

[1] Certain physical characteristics that are not evident from the video were taken from the arrest report. They are included here for frame of reference but are not material to the case or this appeal. Nor are they disputed.

[2] There is no dispute that Patricia had struck Melvin in the face before the officers arrived, or that Officer Deladurantaye could and did recognize that Melvin had been struck in the face. Patricia denied hitting him with the club. To avoid any disputes of potentially material facts, we will accept that she did not hit him with the club.

[3] Officer Deladurantaye's field mic recorded her conversations.

inside the minivan and tried to close the door.[4] Officer Piro stopped approximately two-to-three feet away from the minivan's open side door, but extended his left leg straight out and put his left foot in the door jamb to keep the door from sliding closed, and asked, conversationally, why she was closing the door on him. Patricia snapped back, defiantly, "because I don't want you to walk up on me," and appeared to kick his foot out of the door jamb as she tried again to close the door.[5] Officer Piro immediately moved nearer to the open door and threatened: "Well, I'm gonna f***ing walk up on you, okay? Close the door on me and you're gonna get ripped out of this car." At this point, Officer Piro was standing with both feet on the street as close to the open door as possible; he was standing fully upright (not leaning into the van) with his hands at waist level, slightly inside the van, but not extended in front of him. It is possible that he attempted to touch, actually touched, or even grabbed ahold of Patricia by her nearest extremity (arm, leg, etc.), if it was in his immediate grasp, but it is clear from the video, and beyond question, that he did not bend, extend, or reach into the minivan at that point, nor did he do anything overtly violent, aggressive, or with substantial or overwhelming force. Nonetheless, we cannot see from the video exactly what was happening inside the van during the four seconds that Officer Piro was giving this warning or threat. But we can see in the video that, at the moment he finished saying the word "car," Patricia—apparently leaning back so as to piston her leg out horizontally—kicked him in the midsection, causing him

---

[4] During her deposition, Patricia offered her version of these events, most of which does not match the video. Her most serious, and unfounded, accusation is that she tried to close the minivan door due to her fear because Officer Piro approached her with his hand on his gun. That is not true. The video shows that, when he approached the minivan and began speaking with Patricia, Officer Piro was calm and cordial with his hands at his sides and *not* on his gun.

[5] During her deposition, Patricia denied kicking Officer Piro's foot out of the door jamb but testified that she did try again to close the door. Because the dashcam was pointed at the front of the minivan, giving a profile view of the encounter at the minivan's sliding side door, and because the interior of the minivan was dark, neither action is observable in the video. It appears from Officer Piro's response in the video—both the movement of his foot off the jamb and his instantaneous change in demeanor from cordial to profane and threatening—that she kicked his foot out of the door jamb (and he testified that she did), but insomuch as this is a disputed fact, we will accept that she did not actually kick his foot out of the door jamb. Regardless, this is not a *material* fact. And, while the video does not show her repeated attempts to close the door, we will accept her testimony and consider it undisputed that she did so.

to buckle and take two steps backward, either from the force of the kick or in an effort to avoid it. Then Patricia yelled, "Don't put your hands on me, you have no reason to put your hands on me."[6]

After the kick, Officer Piro looked to Officer Deladurantaye, who was still speaking with Melvin, and then turned back to Patricia and reached into the van with both hands. Officer Deladurantaye left Melvin and went to assist Officer Piro with Patricia, as Melvin can be heard exclaiming, "see what I'm sayin', see what I'm sayin'?," in obvious reference to Patricia's frenzy. While Officer Piro was trying to get hold of Patricia, she continued to kick at him and, when he

---

[6] To avoid any dispute of potentially material facts, we will ignore Officer Piro's account of these unseen events and consider only Patricia's, though Patricia's deposition testimony provides little insight. She testified:

Question: Did you tell [Officer Piro] at that point, don't put your hands on me?
Patricia: Yes.
Question: Why did you tell him that?
Patricia: Because he reached in and tried to grab my ankles.

As discussed in the text, however, it is doubtful—based on the video—that he had "reached in and tried to grab [her] ankles" *prior to* her kicking and shouting. Her testimony continued:

Question: Why did you say don't put your hands on me?
Patricia: Because he didn't have a reason to put his hands on me.
Question: Did you try to kick the officer's hands off you?
Patricia: I did kick.
Question: Did you kick him in the hands?
Patricia: No. I don't remember if it actually hit him or not.
Question: But where did you kick?
Patricia: I just kicked my foot.
Question: Where did you kick your foot at?
Patricia: Just like out, like get away.
Question: And it's your testimony you don't know if you struck the officer when you kicked your foot out?
Patricia: No.
Question: You don't know?
Patricia: I don't know.
Question: You just don't recall one way or the other, that's your testimony?
Patricia: I'm saying I don't remember.
Question: As he tried to pull you out of the car, what did you do to prevent from getting pulled out of the car?
Patricia: I grabbed on to the seat.
Question: And held yourself in the seat?
Patricia: Yes.

For purposes of proceeding on undisputed facts, we will assume that Officer Piro tried to grab Patricia's ankles (as she testified), so she kicked him in the midsection (as seen in the video), then he did reach into the minivan and grab her by the left ankle and begin to pull (as seen in the video), while she held on to the seat to prevent him from pulling her out (as she testified) and continued to kick and fight (as seen in the video).

got a grip on her left ankle and tried to pull her out of the minivan, she held onto a seat creating a bizarre tug of war as Officer Piro put his feet up on the door jamb for leverage and pulled Patricia by the ankle. Meanwhile, Officer Deladurantaye was trying to coax Patricia to stop resisting, let go of the seat, and get out of the van, asking, "Ma'am, do you really want to do this with your kids right there?"; Patricia answered, "Yeah!," and continued to fight. After about five seconds of this tug of war, Officer Piro managed to drag Patricia completely out of the minivan, pulling her by the left ankle at about his waist level while she held the minivan door with her left hand at about the same height, so that she was stretched sideways with her right foot and right hand on the ground. Officer Deladurantaye pried Patricia's fingers from the door and the officers lowered her to the ground: Officer Deladurantaye let Patricia put her left hand down, then Officer Piro put her left ankle down, so that she was on her hands and knees, but she immediately rolled on to her left side and kept fighting and yelling.[7] At this point, 15 seconds after Patricia first kicked Officer Piro in the midsection and after about 10 seconds of struggle, Melvin decided to intervene, so Officer Deladurantaye had to turn back to Melvin to keep him away. A third officer arrived, grabbed Melvin from behind, yanked him away, and wrestled him to the ground.

Meanwhile, Patricia was still thrashing, fighting, and yelling, and Officer Piro was shouting at her to stop resisting and to put her hands behind her back. She refused to comply, both physically and verbally, yelling at him that she would not. After futilely telling her six times to cooperate, Officer Piro tased her in the middle of her back and Officer Deladurantaye was able to cuff Patricia's hands behind her back. Officer Piro went to help subdue and cuff Melvin. While that was going on, Patricia—who is double jointed—brought her cuffed hands up over her head to her

---

[7] In her deposition testimony, and as the basis for this lawsuit, Patricia claimed that the officers slammed her on the ground—on her back, on her face, on her head—causing her back injuries, causing her face to swell (and split her lip), and possibly even causing a concussion. But the video shows that this never happened. The officers never dropped her on the ground, much less slammed her on the ground, and her face and lip did not hit the ground.

6

front, tried to twist free from the officer holding her, and dropped herself onto the ground on her bottom. The officers re-cuffed her behind her back but she again, while in the cruiser, brought her cuffed hands over her head to the front, and then fixed her hair while looking in the car mirror. She was also repeatedly fixing her hair while waiting at the police station. This focus on primping her hair, and her apparent unawareness of or disinterest in any physical injury while at the station, undermines her claims of serious injury and effectively refutes any claim that the officers had reason to recognize that she had a serious medical need, a substantial risk of harm arising from it, or a need to act on it. Photos of her in the record, taken by police during her booking, are of the two prong-marks in her back from the taser, albeit without any evident discoloration or swelling, and of her face and a closer picture of her lips, revealing no evident swelling or an identifiable split lip.

The officers arrested Patricia for domestic-violence-based aggravated felonious assault on Melvin, an aggravated felonious assault on Officer Piro for kicking him, and obstructing a police investigation. Pursuant to a plea agreement, the prosecutor dismissed the latter charges and Patricia agreed to plead guilty to a domestic-violence charge and to enter a diversion program, which led to the dismissal of that charge after she completed a year without further incident. Patricia filed this § 1983 action against Officer Piro, Officer Deladurantaye, and the City of Eastpointe. The defendants all moved for summary judgment, which the district court granted in part, leaving three claims for trial: excessive force by Officer Piro for removing her from the van and tasing her; failure to intervene by Officer Deladurantaye; and deliberate indifference to a serious medical need by Officer Deladurantaye. Officers Piro and Deladurantaye appeal the district court's denial of their motions for summary judgment based on qualified immunity.

**II.**

The denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, and, accordingly, it is generally not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Our jurisdiction is, however, limited: "we may not decide a challenge aimed solely at the district court's determination of the record-supported evidence, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations." *Bunkley v. City of Detroit*, 902 F.3d 552, 560-61 (6th Cir. 2018). Under our pragmatic approach, we "excise the prohibited fact-based challenge" and "follow the same path as did the district court—considering the sufficiency of the plaintiff's proffered evidence, drawing all reasonable inferences in the plaintiff's favor"—to make a legal determination "based on th[e] now (for this purpose) undisputed record facts." *Id.*

Proceeding in this manner, we have jurisdiction over this interlocutory appeal from the denial of qualified immunity. Moreover, in deciding this appeal, we rely primarily—almost entirely, in fact—on our own plenary review of the videotape recordings. *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (holding that the panel must decide for itself whether "the events recorded on the tape justified the officers' conduct"); *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("The Court of Appeals . . . should have viewed the facts in the light depicted by the videotape.").

The officers claim qualified immunity. Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "is an *immunity from suit* rather than a mere defense to liability," *Mitchell*, 472 U.S. at 526, it allows police officers "breathing room to make reasonable

8

but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law," *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quotation marks and citation omitted). The plaintiff in a § 1983 action bears the burden of overcoming the officer's qualified-immunity defense. *Bunkley*, 902 F.3d at 560. At the summary-judgment stage, the plaintiff must show that (1) the defendant officer violated a constitutional right and (2) that right was clearly established. *Id.* At a minimum, this requires that there be a "genuine issue of fact" material to the claim; that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## A.

Patricia accuses Officer Piro of using excessive force, in violation of her constitutional right to be free from such force. In her deposition, she described this claim as follows:

> Question: What exactly did [Officer Piro] do that constitutes excessive force?
>
> Patricia: Pulling me out of a vehicle by my feet and I wasn't under arrest, and they [the other officers] were trying to cuff me as I was being Tased at the time, and also I was slammed onto the ground.

R. 35-2 at 47, PgID 391. The video makes clear that the second and third allegations did not happen: officers did not try to cuff her while she was being tased and she was not slammed to the ground. In this appeal, however, and in the district court, her attorney describes and argues her claims differently, albeit somewhat imprecisely. We proceed on that description.

Patricia's encounter with Officer Piro, from the time he approached her until Officer Deladurantaye handcuffed her and then went to help subdue and handcuff Melvin, lasted about 90 seconds. During that 90 seconds, there were three discrete events or "segments" that comprise Patricia's excessive-force claim: (1) Officer Piro's touching or grabbing her as she sat in the minivan, before she kicked him; (2) Officer Piro's grabbing her by the left ankle and pulling her from the van after she kicked him; and (3) Officer Piro's tasing her while she thrashed on the street

9

refusing to comply with his orders to put her hands behind her back for cuffing. We analyze these events sequentially. *See Morrison v. Bd. of Trs.*, 583 F.3d 394, 401 (6th Cir. 2009) ("A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions."). "This approach requires us to evaluate the use of force by focusing on the 'split-second judgment' made immediately before the officer used allegedly excessive force, not on the poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 978 (6th Cir. 2019) (quotation marks and citation omitted).

The first event is Officer Piro's act of touching or grabbing Patricia in the minivan before she kicked him. Because it is clear from the video that this "grabbing" could not have been overtly excessive or violent, her claim must be that the mere *act* of seizing her physically under these circumstances was *per se* excessive; she has no claim that the amount of force used in effectuating that seizure was excessive. "[A]n officer may seize an individual without offending the Fourth Amendment if the officer has reasonable suspicion that criminal activity may be afoot." *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012) (quotation marks omitted). Reasonable suspicion is a "particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts." *Id*. (quotation marks and citation omitted). "We determine whether an officer has the requisite quantum of proof by looking at the totality of the circumstances." *Id*. "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Id.* (quotation marks and citation omitted). When officers "reasonably believe[] that a crime occurred," and that "the occupant[] of [a] car [was] involved in that crime," the officers have enough reasonable suspicion to remove the car's

occupants from the car and for a potential seizure. *Houston v. Clark Cty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999).

Here, Officer Piro responded to the dispatcher's broadcast of domestic violence—specifically accusing Patricia of domestic violence—and arrived to find Melvin pleading his case that Patricia had been hitting him in the face. Even without Melvin's version of events, Patricia's loud and antagonistic behavior from the moment the officers arrived (particularly in contrast to Melvin's subdued conduct) would have led Officer Piro, or any reasonable officer, to believe that Patricia was the aggressor. It was late at night and dark. And the police dispatcher had said that weapons were unknown. When Officer Piro approached the suspect, Patricia, she withdrew into the dark minivan and tried to close the door. Officer Piro had reasonable suspicion that Patricia had committed a crime, likely a violent domestic assault, and, correspondingly, had reason to take hold of her and seize her physically. A police officer is not obliged to let an allegedly violent suspect close herself into a dark minivan (with children inside) and dictate the terms of his investigation into her alleged violence. It reasonably appears from the video—and would reasonably have appeared to any officer at the scene—that Patricia was intending to avoid or resist investigation. And her combative attitude, shouts and statements, and attempt to close herself into the minivan gave Officer Piro a reasonable basis to suspect that she might pose a safety threat.

Even conceding that Officer Piro's profanity was inappropriate and inflammatory, the mere act of his seizing (i.e., touching or grabbing) her as she sat in the minivan, before she kicked him, was permissible under the Fourth Amendment and the facts of this case. Moreover, neither his profanity nor his act of seizing her justified her response of kicking him in the midsection.

The second event is Officer Piro's removal of Patricia from the minivan after she kicked him. The video shows that he told her that if she tried to close the door on him again, he was going to "rip" her from the van, whereupon she kicked and tried again to close the door, so he grabbed

11

her by the ankle, used the door jamb for leverage, and pulled her from the minivan, overcoming her attempt to kick free and cling to the seat. The Fourth Amendment "protects individuals from the use of excessive force during an arrest or investigatory stop." *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). To determine whether force was excessive, the court "appl[ies] an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). Three factors guide the reasonableness test: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396).

As the video makes clear, every bit of the force that Officer Piro used to remove Patricia from the minivan was necessary to overcome her resistance (i.e., clinging to the seat and kicking); he did not slam or drop her on the ground or commit any other form of gratuitous violence. Therefore, this too is a question of whether the mere *act* of overwhelming her resistance and forcefully removing her physically, under these circumstances, was *per se* excessive; there is no legitimate claim that the amount of force Officer Piro used in effectuating that removal was excessive.

As already discussed, Officer Piro had reason to suspect that Patricia had committed a crime, likely a violent domestic assault, that she was attempting to avoid or resist his investigation, and that she might pose a safety threat to the officers, herself, or the children in the car. He had just warned her: "Close the door on me and you're gonna get ripped out of this car," and she had responded by kicking him and trying to close the door. Officer Piro's split-second decision to grab her by the ankle and pull her from the car was not unreasonable.

Having said that, we do not mean to commend Officer Piro here—he might have been more patient and less threatening (and less profane); he might have ordered Patricia to exit the minivan and given her time to comply voluntarily; or he might have coerced her from the minivan with the threat of tasing, rather than physically overwhelming her and pulling her out. But he was not constitutionally required to do so. Even if we thought that Officer Piro could have used different means to remove Patricia from the minivan during this 20-second struggle, that does not mean that he used more force than is constitutionally permitted. Officer Piro's removal of Patricia from the minivan did not rise to the level of unconstitutional excessive force.

The third event is Officer Piro's tasing Patricia while she thrashed on the street refusing to comply with his repeated orders to put her hands behind her back for cuffing. It is undisputed that Officer Piro discharged the taser into the fleshy part of her back, at ordinary strength and duration. Therefore, there is no legitimate claim that the means of effectuating the tasing was excessive; the question is, again, whether the mere *act* of tasing her, under these circumstances, was *per se* excessive. Our cases establish that police do not use excessive force when they tase someone (even multiple times) who is actively resisting arrest. *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012), *Williams v. Sandel*, 433 F. App'x. 353, 363 (6th Cir. 2011), and *Cockrell v. City of Cincinnati*, 468 F. App'x. 491, 495 (6th Cir. 2012)). The video makes clear that Patricia was actively non-compliant and resisting until and even after Officer Piro tased her. Therefore, this tasing was permissible under the Fourth Amendment and the facts of this case.

Officer Piro is entitled to qualified immunity on this claim.

13

**B.**

Patricia claims that Officer Deladurantaye violated her constitutional rights by failing to intervene to stop Officer Piro's use of excessive force. This claim necessarily fails because Officer Piro did not use excessive force. Moreover, the video refutes this claim for additional reasons.

We have held repeatedly that officers are not liable under failure-to-intervene claims when the ostensible "opportunity and means" to intervene do not last long enough for the officer to "both perceive what was going on and intercede to stop it." *Burgess*, 735 F.3d at 475 (citing *Durham v. Nu'Man*, 97 F.3d 862, 868 (6th Cir. 1996)); *see also Ontha v. Rutherford Cty.*, 222 F. App'x. 498, 506 (6th Cir. 2007). Even if Officer Piro's conduct of removing Patricia from the van and tasing her until she complied with his instructions had been excessive force, Officer Deladurantaye did not have an opportunity or means to intervene to stop it. She was questioning Melvin when Officer Piro began pulling Patricia from the minivan; for a few seconds, she assisted Officer Piro with releasing Patricia's grip from the door and lowering her to the ground; but then she abandoned that assistance when Melvin attempted to intervene and instead she focused on removing Melvin from the struggle. She was not involved in the tasing and had no reason to prevent it.

Officer Deladurantaye is entitled to qualified immunity on this claim.

**C.**

Patricia claims that Officer Deladurantaye's deliberate indifference to her serious medical needs violated her constitutional rights. A cause of action under § 1983 for failure to provide adequate medical treatment requires a showing that the defendants acted with deliberate indifference to the serious medical needs of the arrestee. *Estelle v. Gamble*, 429 U.S. 97 (1976). There are two parts to the claim: objective and subjective. For the objective component, the arrestee must demonstrate "the existence of a 'sufficiently serious' medical need." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825,

14

834 (1994)). For the subjective component, the arrestee must demonstrate that the defendant knew of and disregarded a substantial risk of serious harm to the arrestee's health and safety. *Id.*

Patricia cannot meet either requirement. Her claims are that she suffered an injury where the taser struck her and had bruising on her face and body from being pulled from the van and dropped on the ground. The video shows that she was not slammed or dropped on the ground and that her face and lip never hit the ground. Regardless, these are not *serious* injuries that create a serious medical need. The officers photographed the taser bruise and her face and lip, neither of which showed a serious medical condition. She says she complained to the officers that she needed medical treatment for her face and body injuries, but the lengthy video of her waiting at the station—sitting calmly in the lotus position, primping her hair, moving and walking without any suggestion of discomfort—undermines that assertion. It appears from the video that the officers tried to ensure that she was not seriously injured and to make her comfortable. But, even accepting that she complained to them, she has no evidence that her alleged injury was sufficiently serious or that any officer (much less Officer Deladurantaye, specifically) was subjectively aware of a substantial risk of serious harm from that injury and deliberately disregarded that risk.

Officer Deladurantaye is entitled to qualified immunity on this claim.

### III.

For the foregoing reasons, we REVERSE the district court's denial of qualified immunity and REMAND for issuance of a judgment consistent with this opinion.

**JANE B. STRANCH, Circuit Judge, dissenting.** To have jurisdiction over Defendants' interlocutory appeal, we must view the facts in Siders' favor. *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018). The majority opinion fails to do so. When the most favorable view of the facts is conceded in Siders' favor, *id.*, genuine disputes remain over whether Defendants are entitled to qualified immunity. I therefore respectfully dissent.

## A. Excessive Force

Whether an officer's use of force in effecting an arrest is excessive in violation of the Fourth Amendment turns on "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397 (1989). This analysis is guided by three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Shreve v. Jessamine Cnty. Fiscal Court,* 453 F.3d 681, 687 (6th Cir. 2006)).

When viewing the facts in Siders' favor, as we must, the first *Graham* factor—the severity of the crime—weighs toward affirming the denial of qualified immunity. The Defendants were dispatched in response to a call regarding a domestic disturbance, and all charges against Siders were ultimately dismissed. Melvin and Patricia Siders were arguing over her laptop computer. Patricia Siders did not have any weapons. When Officer Deladurantaye arrived, she was simply investigating and did not initially believe she had any reason to arrest Siders. Officer Piro, moreover, did not tell Siders before he ripped her from the van that she was under arrest or being investigated. In *Kent v. Oakland Cty.*, 810 F.3d 384, 391 (6th Cir. 2016), we found that the severity of the crime factor weighed in the plaintiff's favor because he was never told he was under arrest and did not realize he would be detained until an officer "instructed him that he would be tased if

16

he failed to comply with commands." *Id.*; *see also Grawey v. Drury,* 567 F.3d 302 (6th Cir. 2009) (finding excessive force where officer pepper sprayed man who "was never told he was under arrest."). Ultimately, a jury could conclude that the misdemeanor domestic violence, disrupting the peace, and resisting arrest charges that stemmed from the incident were not "serious" crimes. *Goodwin*, 781 F.3d at 322 (concluding that disputes of material fact existed over whether misdemeanor disorderly conduct was a serious crime); *see also Lee v. Tucker*, 904 F.3d 1145 (10th Cir. 2018) (denying qualified immunity where deputies were dispatched in response to a call regarding potential misdemeanor domestic violence crime because not all calls to police involving allegations of domestic violence entitled deputies to respond with substantial force).

On the second *Graham* factor, the majority opinion concludes that Siders posed an immediate threat to the officer's safety due to "her combative attitude, shouts and statements, and attempt to close herself into the minivan." But the conclusion that, as a matter of law, Siders posed an immediate threat to Piro's safety cannot be squared with our case law and with the requirement that we view the facts in the light most favorable to Siders. Piro testified at his deposition that Siders did not do or say anything to him that made him think he was in some sort of danger as he walked up to her. As he approached Siders, he asked, "how are you doing ma'am?" She responded, "I'll be good when I get my stuff," referring to her laptop computer and other valuables, which she believed Melvin Siders had taken from her home.

Patricia Siders was frightened as Piro approached, and she attempted to close the van's sliding door. She was going to speak with Piro, but she preferred to do so with the door closed. As the sliding door began to close, Piro asked, "is there a reason why you are closing this door on me?" and stuck his foot in front of the door so that it would not close. Siders responded, "because I don't want you to walk up on me." Piro answered, "well I'm gonna fucking walk up on you, okay? Close the door and you're going to get ripped out of the car." He did not order Siders to

17

get out of the van; and he did not tell her she was under arrest. I do not disagree with the majority opinion's conclusion that Piro had the authority to order Siders to exit the vehicle, but the record does not show that he did. And on interlocutory appeal, we are required to view the facts in Siders' favor—we cannot treat Piro's unwarranted threat as if it were a police order.

The video shows Piro then escalating the situation, apparently in response to Siders' attempt to close the van's sliding door after his threat. Viewing the facts in the light most favorable to Siders, her conduct in that moment did not threaten Piro's safety or even his ability to investigate because she was willing to speak with him, she just preferred to do so from inside the car. The record does not support the majority opinion's conclusion that the video blatantly contradicts Siders' version of events. It is for a jury to decide, moreover, whether Sider's testimony about her present sense impression, feelings, and plan (i.e. that she was frightened as Piro approached and that she planned to speak with Piro but preferred to do so with the door closed) is credible in light of the video evidence. Even to the extent that the video shows Piro did not have his hand on his gun, that fact does not dispute Siders' description of her perception and feelings as he approached and after his threat.

It is also undisputed that Siders "was unarmed and made no evasive movements to suggest [she] had a weapon." *Kent*, 810 F.3d at 391 (finding no immediate threat to officer safety where plaintiff was unarmed and made no movement to suggest he had a weapon). A jury could conclude that Piro's escalation of the situation placed him and his colleagues in greater danger than if he had proceeded with his investigation without pulling Siders from her seat in the middle of the van with her children. Specifically, Deladurantaye was injured in the "scuffle," which could have been avoided if Piro had asked Siders questions without prying her by her ankles from the middle seat of her van and throwing her to the ground.

Once Siders was on the ground, a jury could conclude that she posed no greater or more immediate threat of danger to Piro. Although she continued to object to the officers' touching her, responded "no" at one point when asked to put her arms behind her back, and flailed about, she was also sitting or lying on the ground, still unarmed and making no threats of violence. Her children were in the car. And a jury could reasonably conclude that she would not pose a threat to the officers because she was unarmed and concerned about keeping her children out of harm's way; while she and Melvin Siders both lay on the ground, their children began to cry in the van, and she looked toward them, waved at them with one arm, and sought to comfort them by saying "it's ok baby." At this stage of the case and viewing the record favorably toward Siders, the evidence that advances Defendants' position that Siders posed a threat—"her combative attitude, shouts and statements, and attempt to close herself into the minivan"—simply create disputes of material fact that a jury should resolve.

The third *Graham* factor requires the court to consider whether Siders was actively resisting arrest or evading arrest by flight. The facts viewed in the light most favorable to the Siders present two distinct periods of possible resistance: first, the time leading up to when Piro pulled Siders from the vehicle; and second, the period during which Siders was sitting and lying on the pavement.

The constitutional analysis of the first period turns on whether Siders' attempt to close the van door when she had not been ordered out of the car, but Piro had threatened, "[c]lose the door and you're going to get ripped out of the car," constitutes active resistance. The majority opinion concludes that "the video makes clear, every bit of the force that Officer Piro used to remove Patricia from the minivan was necessary to overcome her resistance (i.e., clinging to the seat and kicking)." (Maj. Op. at 12) This conclusion is inconsistent with the opinion's fair recognition that "a reasonable person viewing the video of this incident could characterize" Piro's actions as

19

"overzealous, and perhaps unnecessary" and that whether Siders kicked Piro's foot is a disputed fact or immaterial. (Maj. Op. at 2, 4 n.5) To be sure, active resistance to an officer's command can legitimize an officer's use of force. *Goodwin*, 781 F.3d at 323. "Such resistance can take the form of 'verbal hostility' or 'a deliberate act of defiance.'" *Id.* (quoting *Eldridge v. City of Warren,* 533 Fed. Appx. 529, 534–35 (6th Cir. 2013)). But passive resistance is not enough to legitimize an officer's use of force. *Id.* at 323–24 (finding passive resistance where an officer asked the plaintiff to step out of his apartment, but the plaintiff "refused, saying that he did not have to come outside, and withdrew into the apartment."). *Id.* When Siders sought to close the van door, she was not yet under arrest, and Piro had given her no verbal command. Also, she was sitting in a passenger seat in the middle the van so could not have been attempting to flee. *Compare Caie v. W. Bloomfield Twp.,* 485 Fed. Appx. 92, 96 (6th Cir. 2012) (finding plaintiff's "attempts to flee—including getting behind the wheel of his car and trying to drive away" justified use of force). And the record indicates that she still planned to answer Piro's questions, just from inside the van. The majority opinion focuses on evidence in the record that Siders backed away from Piro and, according to Piro, kicked out her foot after Piro threatened her, but concedes that the video does not show Siders kicking Piro and suggests that it is not relying on the kick as a material fact. (Maj. Op. at 4 n.5) That leaves only evidence of Siders' passive resistance to a threat, not an order. Our case law does not support a finding that force is appropriate under these circumstances. *Goodwin*, 781 F.3d at 323–25; *Eldridge,* 533 Fed. Appx. at 534–35.

The constitutional analysis of the second period of possible resistance should turn on whether Patricia was actively resisting as Piro tased her. Although it is constitutionally permissible for a police officer to use a taser against a suspect who is actively resisting arrest by "physically struggling with, threatening, or disobeying officers," *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015), "[w]e have held that even previously-resisting suspects have a constitutional right to

be free of a gratuitous application of a Taser once they have stopped all resistance," *Goodwin*, 781 F.3d at 324. The majority opinion improperly melds the analysis of distinct periods, finding that Patricia "thrashed on the street refusing to comply with [Piro's] repeated order," when in fact, at the time the video shows Piro using his taser, Siders is lying on her side on the ground, trying to comfort her children. Therefore, even if a jury concludes that Siders had earlier resisted arrest by rolling away from Piro, "physically struggling," and disobeying his order to put her hands behind her back, the jury could determine that when the taser was deployed, she had stopped resisting and the force used against her was excessive.

The final step of the Graham analysis requires the court to inquire "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Graham*, 490 U.S. at 396 (quoting *Tennessee*, 471 U.S. at 8–9). The "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" called for in *Graham* indicates that a jury could reasonably find that Piro violated Patricia's Fourth Amendment right to be free from excessive force. Piro's decision to pry Patricia from the middle seat of her van by the ankles onto concrete in front of her children was out of proportion to the situation presented: Piro's training taught him to de-escalate when possible and to use only the amount of force necessary to confront a situation. As Deladurantaye described, "[i]f we go to a situation and the person is calm, we approach them in a calm manner" and the amount of force used is "based on the force you're given." A jury could conclude that Siders was calm when Piro first approached her—she told him "I'll be good when I get my stuff," referring to her laptop and possessions she said Melvin Siders had taken—and that Piro was responsible for the situation's escalation. Analysis of the totality of the circumstances must also consider the context, that the officers were dispatched to address a domestic dispute. Although Melvin Siders called the police, claiming that Patricia Siders had been violent with him, when the police arrived, it was Melvin

Siders who had a weapon and Patricia Siders who was sitting in the van with their children. Observing the situation, a reasonable person could conclude that Patricia Siders had been a victim. In this context, a jury could also determine that Piro's decision to rip Siders from the van was unreasonable and excessive.

Application of the *Graham* factors to the facts taken in the light most favorable to Patricia shows: (1) that Patricia's misdemeanor offenses were not serious, (2) there was little basis to believe Patricia was a threat to the officers or others, (3) Patricia's withdrawal into the van was at most a passive refusal to comply with an unwarranted threat ("close the door and you're going to get ripped out of the car"), and (4) she had stopped resisting when Piro tasered her. The majority opinion's contrary conclusions rely on Defendants' challenges to Patricia's version of events, which have no place in our qualified immunity analysis in an interlocutory appeal. The facts viewed most favorably to Patricia, as we must at this stage, state a constitutional violation.

We should therefore reach the next constitutional question—whether the violated right was clearly established at the time of the alleged violation. Framed properly, we should ask 1) whether a potential misdemeanant, who has not been placed under arrest and who has neither fled nor resisted investigation, has a clearly established right not to be forcibly removed by her ankles from a passenger seat of her car, and 2) whether a potential misdemeanant has a right not to be tasered when she is lying on the ground and has stopped resisting. I would answer these questions affirmatively because Piro had "fair warning" that his actions were unconstitutional. *Goodwin*, 781 F.3d at 325 (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)). *Goodwin* also explained that force used against a plaintiff "absent a statement that he was under arrest or an order to get on the ground or something similar" was excessive after plaintiff's passive resistance because "it was not objectively apparent that Officers intended to take [plaintiff] into custody, or that he was not free to remain in his home." *See id.* at 326; *see also Eldridge*, 533 Fed. Appx. at

530–31, 535 (affirming denial of qualified immunity where officers confronted an erratic driver who passively resisted several commands that he exit his vehicle until officers forcibly removed him from the car and tased him multiple times).

The majority opinion is fair in acknowledging that Piro could have achieved his goal of investigating or arresting Siders without using any force: "he might have been more patient and less threatening (and less profane); he might have ordered Patricia to exit the minivan and given her time to comply voluntarily; or he might have coerced her from the minivan with the threat of tasing, rather than physically overwhelming her and pulling her out." (Maj. Op at 13) This honest acknowledgement suggests that the amount of force used was not reasonable and, in my view, shows that the force used was objectively unnecessary to investigating Siders or effecting her arrest. It was therefore excessive in violation of the Fourth Amendment. *Graham,* 490 U.S. at 397.

Because Patricia had a clearly established constitutional right not to be pulled from her car by the ankles onto concrete in front of her children when she was, at most, passively resisting investigation, and because she also had a clearly established right not to be gratuitously tasered after ceasing resistance, I would affirm the district court's denial of summary judgment with respect to the excessive force claim against Piro.

## B.  Failure to Protect

Though it is a closer call, in my view, Siders has also presented sufficient evidence for a jury to rationally determine that Officer Deladurantaye failed to protect Siders from excessive force. As discussed above, the facts accepted in the light most favorable to the Plaintiff show that Piro's use of force against Siders was excessive. Deladurantaye was within feet of Siders and Piro during the duration of their interaction but did not attempt to de-escalate the situation. Instead, she helped to pry Siders from her vehicle even though—when she came on the scene—Deladurantaye

23

did not believe she had any reason to arrest Siders and she observed that Melvin Siders had a weapon while Patricia Siders was sitting unarmed in a passenger seat of the van.

Because *Officer* Deladurantaye had a clearly established duty to protect Siders, and the facts indicate that she failed in this duty, I would affirm the district court's denial of qualified immunity on this claim.

### C. Failure to Provide Medical Attention

As with Defendants' other claims to qualified immunity, we must not resolve genuine disputes of material fact in Defendants' favor in analyzing Siders' deliberate indifference claim.

Regarding the objective prong, Siders argues that she had a sufficiently serious medical need because her injuries were "so obvious that even a lay person would easily recognize the need for medical treatment." *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013). The district court agreed, noting "I think it's a fact question . . . whether or not the mark on her back and the big lip and so forth is enough for the constitutional requirement of being able to show that there was a serious medical need." (R. 52, Motion for Summary Judgment Hearing and District Court's Ruling, PageID 742) The record confirms that officers could see Siders' injuries with the naked eye, indicating that a jury could conclude that "even a lay person would easily recognize the need for medical treatment." Given the injuries to Siders' face, a jury could conclude that the officers should have considered whether Patricia had suffered a head trauma or concussion and needed medical treatment.

Turning to the subjective prong, as already described, Defendants knew of Siders' injuries, but Siders asserts that she did not receive any medical attention. The booking room video does not blatantly contradict these facts. Although it shows an officer telling Siders that she would get her some ice, it does not show Siders receiving any ice or other medical attention. To obviate "the need to dismiss the entire appeal for lack of jurisdiction," we should "ignore" Defendants'

24

"attempts to dispute the facts," and assume that Siders did not receive any medical care. *Diluzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 611 (6th Cir. 2015) (quoting *Estate of Carter*, 408 F.3d at 310). Viewing the facts in the light most favorable to Siders, a jury could conclude that Defendants knew of Siders' need for medical attention and acted with deliberate indifference by failing to provide her with any medical care.

For all of these reasons, I respectfully dissent from the holdings of the majority opinion.